IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ciri Johnson,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jo Anne B. Barnhart, Commissioner of Social Security,<br><br>　　　　Defendant. | No. CIV 04-310-TUC-JMR (GEE)<br><br>**REPORT AND RECOMMENDATION** |

    The plaintiff filed this action for review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g). The case has been referred to the United States Magistrate Judge pursuant to the Rules of Practice of this court.

    Pending before the court is a motion for summary judgment filed by the plaintiff on January 10, 2005, and a cross-motion for summary judgment filed by the defendant on March 21, 2005. [#12, 18][1]

    The Magistrate Judge recommends that the District Court, after its independent review, grant the plaintiff's motion and deny the defendant's cross-motion for summary judgment. The final decision of the Commissioner is not supported by substantial evidence. She failed to give appropriate weight to the opinion of Johnson's treating physicians, Pritchard and Goldwasser. She also improperly discounted Johnson's own subjective testimony of disability.

---

[1] Clerk's record number.

## PROCEDURAL HISTORY

On November 13, 1996, Johnson filed an application for social security disability insurance benefits alleging a disability that began on January 1, 1996, due to chronic fatigue syndrome and tendonitis in her right hand. (Tr. 80, 91).

The Social Security Administration (SSA) denied her application initially and again upon reconsideration. (Tr. 61-65, 67-70). Johnson requested review and on September 14, 1998, appeared before Administrative Law Judge (ALJ) Norman R. Buls. (Tr. 16, 71). The ALJ found Johnson was not disabled. (Tr. 15-29). Johnson appealed the ALJ's decision, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 12-14, 9-10, 6-7); 20 C.F.R. §§ 404.981. She then filed a complaint in U.S. District Court appealing the Commissioner's final decision.

U.S. Magistrate Judge James C. Carruth reviewed the record and recommended the case be remanded because substantial evidence did not support the ALJ's determination that Johnson could return to her past relevant work. (Tr. 577-99). U.S. District Court Judge William D. Browning adopted the Magistrate Judge's recommendation and remanded the case to the Appeals Council which remanded the case to the original ALJ. (Tr. 600-01, 602-03). Johnson requested another ALJ on the grounds that she would not receive a fair hearing from ALJ Buls, but her request was denied. (Tr. 561).

On May 20, 2003, Johnson again appeared before ALJ Buls. (Tr. 853). The ALJ again found Johnson was not disabled. (Tr. 558-60). Johnson appealed the ALJ's decision, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 539-41); 20 C.F.R. §§ 404.981. She then filed the instant complaint in U.S. District Court appealing the Commissioner's final decision.

Johnson filed the instant motion for summary judgment on January 10, 2005. The Commissioner filed the instant cross-motion for summary judgment on March 21, 2005. Johnson filed a reply and response on April 12, 2005.

Claimant's Work History and Medical History

Johnson was born in 1956. (Tr. 95). She was 41 years old on December 31, 1997, the date her insured status expired. (Tr. 562). She is a high school graduate and has a bachelor of fine arts degree and a master of arts degree in painting and sculpture. (Tr. 42). She worked from 1987 to 1996 as a freelance graphic designer. (Tr. 118). She claimed in her original application she cannot work because she has chronic fatigue syndrome and tendonitis in her right hand. (Tr. 91).

In July of 1990, Allen Radin, M.D., diagnosed strain and tendonitis in Johnson's right second finger due to computer use. (Tr. 180). He prescribed Naprosyn. *Id.*

In November of 1990, Radin diagnosed chronic fatigue syndrome based in part on the presence of the Epstein-Barr virus. (Tr. 178-79). Johnson was unable to work at this time due to exhaustion. *Id.* Johnson moved to Tucson from New York City in late 1991. (Tr. 113).

Brian Cabin, M.D., has been Johnson's primary care physician since August of 1991. (Tr. 94-95). From the end of 1991 to at least mid-1996, Cabin administered injections of magnesium and B-vitamins approximately every ten days for her chronic fatigue syndrome. (Tr. 95, 222-24, 227-28, 231-37, 240-47, 252-55, 263, 265-70, 272-77).

In March 1993, Anne Nemeth, O.T.R./l.r., performed a functional evaluation of Johnson's hand and diagnosed chronic tenosynovitis. (Tr. 258-60). John W. Madden, M.D., suggested a diagnostic surgical release of the long finger of her right hand. (Tr. 257).

In April of 1996, Cabin noted Johnson was continuing to improve. (Tr. 225). Her energy level was normal for half of the year. (Tr. 225). In November of 1996, however, Cabin noted Johnson's CFS symptoms had increased. (Tr. 222). She was experiencing fatigue, sleep disturbance, cognitive dysfunction and depression. *Id.*

In November of 1996, Cabin dictated a summary of Johnson's physical condition. (Tr. 217). He noted a diagnosis of chronic fatigue syndrome (CFS) based in part on Epstein-Barr virus titer history. (Tr. 217). Johnson complained of daily severe fatigue, headaches, sleep disorders, severe allergies, muscle and joint pains, muscle weakness, mood alteration, difficulty with concentration, sore throats, low grade fevers, and exercise intolerance. *Id.* His assessment

is as follows: "symptoms consistent with chronic fatigue syndrome, B12 deficiency resolved, mild elevation of the ALT, Depression." (Tr. 219).

In November of 1996, Judy A. Hutt, N.M.D., noted a diagnosis of Chronic Fatigue Immune Dysfunction Syndrome. (Tr. 200, 212). She opined Johnson was unable to work and that this inability would last for at least one year due to the severity of the illness. *Id.*

Barbara E. Pritchard, Ph.D., completed a Mental Impairment Report in December of 1996. (Tr. 281-84). She has been treating Johnson weekly since March of 1992. *Id.* She diagnosed Major Depressive Disorder, recurrent Moderate, Dysthymic Disorder, late onset, Chronic Fatigue Syndrome, with a GAF of 60. *Id.* She noted difficulty with remembering detailed instructions and sustaining concentration. *Id.* She noted Johnson alternates frequent rest periods with periods of overexertion. *Id.*

In January of 1997, a State Agency psychologist, Diers, evaluated the record and concluded Johnson had the affective disorders of major depressive disorder and dysthymic disorder. (Tr. 285-93). She displayed anhedonia, decreased energy, difficulty concentrating or thinking and depressed mood. *Id.* She had concentration deficiencies occurring intermittently between seldom and often. *Id.* A functional capacity assessment rated her "ability to understand and remember detailed instructions," "her ability to carry out detailed instructions," and "her ability to maintain attention and concentration for extended periods" as somewhere between "not significantly limited" and "moderately limited." (Tr. 310-13). Her "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances" was "not significantly limited" as was her "ability to complete a normal work day and workweek without interruption from psychologically based symptoms," and her "ability to respond appropriately to changes in the work setting." *Id.*

In February of 1997, Gerald Altschuler, M.D., examined Johnson for the Disability Determination Service. (Tr. 294-99). He found Johnson could perform work related activities such as sitting, standing, walking, lifting, carrying, handling, speaking and traveling. *Id.* He noted a "marked symptomatology related to depression." *Id.*

1    In April of 1997, Judy A. Hutt, N.M.D., diagnosed Johnson with Fibromyalgia, chronic
2 fatigue immune deficiency syndrome and adrenal hypofunction. (Tr. 300).

3    In May of 1997, Barbara E. Pritchard, Ph.D., evaluated Johnson's psychiatric condition
4 for the Disability Determination Service. (Tr. 314-16). Pritchard diagnosed major depressive
5 disorder, recurrent moderate; dysthymic disorder, late onset; posttraumatic stress disorder,
6 chronic, with delayed onset; and chronic fatigue syndrome. *Id.* Pritchard noted an ongoing
7 improvement in Johnson's ability to manage stress. *Id.* She also noted a decline in her physical
8 health in the last year to year and a half that exacerbated both her depressive symptoms and her
9 ability to cope. *Id.*

10    In May of 1997, the State Agency psychologist, R.D. Martin, reviewed the State Agency
11 evaluation of January 1997, and affirmed it as written. (Tr. 285-93); (Tr. 310-13).

12    In September of 1997, Pritchard wrote a treatment summary. (Tr. 338-40). She
13 reiterated her diagnosis of major depressive disorder, recurrent, moderate; dysthymic disorder,
14 late onset; posttraumatic stress disorder, chronic, with delayed onset; and chronic fatigue
15 syndrome. *Id.* She recommended continued psychotherapy. *Id.*

16    In November of 1997, Pritchard completed a psychiatric review technique form. (Tr.
17 356-63). She diagnosed affective disorder and anxiety related disorder. She diagnosed the
18 former based on "disturbance of mood accompanied by depressive syndrome characterized by
19 sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating
20 or thinking, thoughts of suicide and paranoid thinking." *Id.* She diagnosed anxiety disorder
21 based on "recurrent and intrusive recollections of a traumatic experience which are a source of
22 marked distress" and "physiological reactivity; avoidance of trauma associated stimuli" and
23 "startles easily." *Id.* She has a "marked" "restriction of activities of daily living," "constant"
24 "deficiencies of concentration;" and "repeated" "episodes of deterioration or decompensation
25 in work or work-like settings." *Id.*

26    In November of 1997, Pritchard also completed a mental work tolerance
27 recommendations form. (Tr. 351-53). She rated Johnson's "ability to understand and remember
28 detailed instructions" as "moderately limited." *Id.* She rated her "ability to maintain attention

and concentration for extended periods" as "markedly limited." *Id.* She rated her ability to "maintain attention and concentration for brief periods" as "moderately limited." *Id.* Her "ability to complete a workday and workweek . . . and perform at a consistent pace without more than the normal rest period" was "markedly limited." *Id.* She was "moderately limited" in her "ability to work in coordination with others . . . without being distracted by them;" her "ability to accept instructions and respond appropriately to criticism from supervisors," her "ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes," and her "ability to travel in unfamiliar places or to use public transportation." *Id.* If all her limitations were accommodated she could work two hours per day in a five-day workweek. *Id.* Pritchard opined these limitations described Johnson's impairments between 1995 and November of 1997. *Id.*

Johnson's insured status ended on December 31, 1997 – her Date Last Insured (DLI).

Hutt completed a medical work tolerance recommendation form in December of 1997. (Tr. 354-55). She opined Johnson could work two to three hours per day, three days per week. *Id.* She would miss 10-14 days of work per month. *Id.* (The average worker misses 0.8 days per month.) *Id.*

In January of 1998, Harry Goldwasser, M.D., began treating Johnson for her mental condition. (Tr. 368-71). He diagnosed major depression, recurrent, moderate; anxiety disorder, not otherwise specified; rule out obsessive compulsive disorder; fibromyalgia; global assessment of functioning of 55. *Id.*

In September of 1998, Hutt wrote a comment to Altschuler's assessment of January 1997. (Tr. 378-81). She maintains Johnson meets the Centers for Disease Control's diagnostic criteria for chronic fatigue syndrome and fibromyalgia. *Id.* Altschuler's insinuations to the contrary, she argues, are unfounded. *Id.* Hutt takes issue with Altschuler's implied criticism of Johnson's choice to pursue a "natural and integrative" approach to her ailment. *Id.* Altschuler asserted this approach is not the "normative therapeutic procedure used in the medical community for treatment of chronic fatigue syndrome." *Id.* Hutt argues the medical

community has, in practice, nothing to offer for the treatment of CFS other than analgesics and antidepressants. *Id.*

In September of 1998, Pritchard wrote a comment to Diers' psychiatric review and technique form. (Tr. 384-85). She was surprised Diers did not refer to Johnson's post traumatic stress disorder which Pritchard believes has a significant effect on her ability to work. *Id.* She also questioned his statement that he has insufficient evidence to evaluate her episodes of deterioration or decompensation in the workplace. *Id.* Pritchard believes Johnson's impairment in this area is quite noticeable. *Id.* Her difficulty in maintaining concentration has prevented her from completing assignments on time and has caused her to lose clients. *Id.* She also believes Diers underestimates Johnson's difficulties with maintaining concentration, social functioning, and performing tasks involving some degree of detail and complexity. *Id.*

In October of 1998, Frank Gomez, M.D., examined Johnson for the Disability Determination Service. (Tr. 386-88). He noted her current diagnosis of depression and chronic fatigue syndrome. *Id.* He observed "generalized muscle weakness, decreased muscle tone with poor ambulation but normal sensory function throughout and without muscle or joint tenderness." *Id.* He notes her prognosis "would have to be poor and most likely her current state of debility will be her new level of functioning." *Id.*

In July of 1999, rheumatologist J. Steven Strong, M.D., evaluated Johnson's condition. (Tr. 398-99). He concluded she had fibromyalgia which overlapped her chronic fatigue syndrome. *Id.* He completed a medical work tolerance recommendations form and concluded Johnson could perform sedentary work one to three hours per day and three days per week. (Tr. 400-01).

In August of 2000, Goldwasser wrote a summary of Johnson's condition. (Tr. 406-07). He stated "it is my unequivocal medical opinion that Ms. Johnson is completely disabled by a Major Depressive Disorder, recurrent, severe." *Id.* He concluded her disability began in 1996. *Id.*

On September 14, 1998, Johnson appeared with counsel at a hearing before Administrative Law Judge (ALJ) Norman R. Buls. (Tr. 38-58). She testified she was unable to work due to physical pain and fatigue. *Id.*

In May of 2003, Goldwasser wrote a summary of Johnson's condition based on his treatment notes and his review of her medical records from Drs. Altschuler, Pritchard and Gomez. (Tr. 620-21) He wrote: "At the risk of sounding dramatic, I want to go on record as saying that in my 15 years of practicing medicine I have never witnessed such a clear and convincing case of a suffering mentally ill person who continues to be denied disability." *Id.* Johnson has "Major Depression, severe and Somatoform Disorder." *Id.* Her symptoms include depressed mood, crying spells, frequent thoughts of suicide, anhedonia, poor appetite and inability to gain weight, chronic sleep disturbance, anergia, diminished cognitive ability including decision making memory and difficulty concentrating." *Id.* "Her suffering is daily, fundamentally life altering and severe." *Id.* "There is no job on earth that could tolerate her illness toward a work schedule." *Id.*

On May 20, 2003, after remand from the District Court, Johnson again appeared with counsel before ALJ Buls. (Tr. 653-82). She discussed in detail aspects of her mental condition such as her feelings of hopelessness, intolerance to criticism, chronic anxiety, difficulty concentrating, difficulty remembering things and keeping appointments, and hypersensitivity to noise and distractions. *Id.* The ALJ asked vocational expert, Ruth Van Vleet, to opine as to Johnson's ability to work assuming she could perform sedentary work but with moderate limitation in the ability to understand and remember detailed instructions and the ability to maintain attention and concentration for extended periods. *Id.* Vleet opined that Johnson could perform her past relevant work as a graphic designer or work as an inbound call center worker, perform basic assembly type work or work as a gaming cash worker. *Id.*

CLAIM EVALUATION

Social Security Administration (SSA) regulations require that disability claims be evaluated pursuant to a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920; *Baxter*

*v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir.1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two which requires a determination of whether the claimant has a "medically severe impairment or combination of impairments." 20 C.F.R. §§ 404.1520(c), 416.920(c).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limits or restricts his or her "physical or mental ability to do basic work activities." *Id*. If the ALJ concludes the impairment is not severe, the claim is denied. *Id*. Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled, and no further inquiry is necessary. *Ramirez v Shalala,* 8 F.3d 1449, 1452 (9th Cir.1993). If the claimant's impairment does not meet or equal a listed impairment, evaluation proceeds to the next step.

The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity[2] (RFC) to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the ALJ concludes the claimant has sufficient RFC, then the claim is denied. *Id*. If the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(f); 416.920(f).

---

[2] Residual functional capacity is defined as that which an individual can still do despite her limitations. 20 C.F.R. § 404.1545.

The ALJ's Findings

The ALJ noted that Johnson's Date Last Insured (DLI) was December 31, 1997. (Tr. 561-68). At step one of the disability analysis, the ALJ found Johnson had not engaged in any substantial gainful activity since her alleged onset date. *Id.* At step two, he found Johnson had severe impairments. *Id.* At step three, the ALJ found Johnson's impairments did not meet or equal the criteria for any impairment found in the Listing of Impairments, Appendix 1, Subpart P, of 20 C.F.R., Part 404. *Id.* At step four, the ALJ concluded Johnson is unable to perform her past relevant work. *Id.* Nevertheless, he believed she had the ability to perform a significant range of sedentary work. *Id.* At step five, the ALJ concluded Johnson could perform a significant number of jobs in the national economy such as in-bound call center worker, basic assembly worker, or casino gaming cash worker based on the testimony of a vocational expert. *Id.*

STANDARD OF REVIEW

An individual is entitled to SSI disability benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 1382c(a)(3)(A). "[A] claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy." *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

1 The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). The Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th Cir.1988); *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir.1987). The standard is less than a "preponderance of the evidence" standard. *Matney,* 981 F.2d at 1019.

"[I]f the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (citing *Richardson,* 402 U.S. at 400). When applying the substantial evidence standard, however, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir.1975). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Id*. at 1156. A denial of benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence. *Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002); *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.1978).

In evaluating evidence to determine whether a claimant is disabled, the opinion of a treating physician[3] is entitled to great weight. *Ramirez v. Shalala,* 8 F.3d 1449, 1453-54 (9th Cir.1993). The Commissioner may reject a treating physician's uncontradicted opinion only

---

[3] The term "physician" includes psychologists and other health professionals who are not medical doctors. *Lester v. Chater*, 81 F.3d 821, 830 n.7 (9th Cir.1995).

- 11 -

1 if she sets forth clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830
2 (9th Cir.1995); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). If the treating
3 physician's opinion is contradicted by another doctor, the Commissioner may reject that opinion
4 only if she provides specific and legitimate reasons supported by substantial evidence in the
5 record. *Lester,* 81 F.3d at 830. No distinction is drawn "between a medical opinion as to a
6 physical condition and a medical opinion on the ultimate issue of disability." *Rodriguez v.*
7 *Bowen*, 876 F.2d 759, 761 n.7 (9th Cir.1989).

When medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). The Commissioner's finding that a claimant is less than credible, however, must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir.1997).

The ALJ need not accept the claimant's subjective testimony of disability, but if he decides to reject it, "[he] must provide specific, cogent reasons for the disbelief." *Lester,* 81 F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

//
//
//
//

DISCUSSION

The decision of the ALJ is not supported by substantial evidence. He failed to give appropriate weight to the opinions of Johnson's treating physicians, Pritchard and Goldwasser. He also improperly discounted Johnson's own subjective testimony of disability.

The ALJ's analysis of Johnson's residual functional capacity (RFC) at step four of the disability analysis is not supported by substantial evidence. The ALJ concluded from the

1  medical record that Johnson retained the ability to perform sedentary work "except as limited
2  by occasional difficulties with pushing/pulling, inability to climb, balance, stoop, kneel, crouch,
3  or crawl on more than an occasional basis, as well as psychological nonexertional restrictions
4  consisting of moderate limitations in her ability to understand, remember, and carry out detailed
5  instructions, and moderate limitations in her ability to maintain attention or concentration for
6  extended periods." (Tr. 567). At the hearing, he asked the vocational expert if Johnson could
7  work assuming she had this RFC. (Tr. 675-76). The vocational expert opined that Johnson
8  could perform her past relevant work as a graphic designer or work in an inbound call center,
9  perform basic assembly or work as a gaming cash worker. (Tr. 676-78).

10  The District Court, however, previously determined that Johnson's RFC prevented her
11  from returning to her work as a graphic designer. (Tr. 601). The court remanded the case to
12  allow the ALJ to correctly assess Johnson's RFC and determine whether or not she could
13  perform other work in the national economy. *Id.* On remand, the ALJ concluded Johnson had
14  only "moderate limitations in her ability to understand, remember, and carry out detailed
15  instructions, and moderate limitations in her ability to maintain attention or concentration for
16  extended periods." (Tr. 567). These limitations, however, do not preclude her from working
17  as a graphic designer, something the court already determined she could not do considering the
18  severity of her impairments. The ALJ's assessment of Johnson's RFC, therefore, underestimates
19  the extent of her mental impairments. His hypothetical to the vocational expert did not properly
20  describe the extent of Johnson's impairments. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th
21  Cir. 1984). Her opinion, therefore, is not substantial evidence supporting the ALJ's conclusion
22  that Johnson is not disabled. *Id.*

23  The ALJ underestimated the extent of Johnson's impairments because he failed to
24  properly evaluate the medical record. *See* (Tr. 596). In particular, he failed to give appropriate
25  weight to her treating physicians, Goldwasser and Pritchard. "Because treating physicians are
26  employed to cure and thus have a greater opportunity to know and observe the patient as an
27  individual, their opinions are given greater weight than the opinions of other physicians."
28  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.1996). Here, Goldwasser and Pritchard conclude

- 13 -

Johnson is unable to work due to her depression. (Tr. 351-53, 406-07). Their opinions are contradicted by the opinions of the non-examining State Agency physicians. (Tr. 59-60). If the treating physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. This he did not do.

The ALJ critiqued the opinions of Pritchard and Goldwasser as follows:

> What is clear, and in no way diminished by the additional records provided by both Drs. Pritchard and Goldwasser is that her earnings history and testimony clearly supports the conclusion that the claimant remained capable of performing substantial gainful activity well after the date she had been diagnosed with depression. Her appointment with Dr. Goldwasser in January 1998 was apparently the first time any of her treatment providers recommended or even prescribed psychotropic medications. This is not to suggest that the mere prescription of psychotropic medications alone was proof of disability. However, given the lack of significant mental status testing, diagnostic tests, or even a Global Assessment of Functioning Score (GAF), it was one of the few tangible means of measuring any progression in the disorder. For the above referenced reasons, the undersigned attributed little weight to the above referenced conclusions that she was disabled.

(Tr. 564-65). The record, however, does not support the ALJ's analysis.

Contrary to the ALJ's assertion, Johnson's earnings record supports her claim of disability. Johnson claims her condition became disabling on January 1, 1996. That year, she earned $2,000 between January and September – or $222.22 per month. The regulations presume earnings of less than $300 per month show the claimant was not engaged in substantial gainful activity. 20 C.F.R. § 404.1574(b)(3). Johnson's earning record supports her doctors' assertion that her depression prevented her from working after her disability onset date.

The ALJ also notes that Johnson was able to work after her first diagnosis of depression. It is not clear why the ALJ believes this is important. Johnson displayed symptoms of depression as far back as 1986. (Tr. 281). She was able to work at that time because her symptoms were mild at first. Her depressive symptoms later became more disabling when her physical health began to deteriorate. *Id.*; (Tr. 222); (Tr. 314-16). By the beginning of 1996, her depressive symptoms were exacerbated to the point that she was unable to work. (Tr. 281, 314-16). Johnson's ability to work in 1986 proves her depression was mild at that time. It does not prove she was able to work in 1996.

- 14 -

1          Also contrary to the ALJ's assertion, January of 1998 was not the first time Johnson's
2   treating physicians considered psychotropic medication. See (Tr. 410). Pritchard considered
3   prescribing psychotropic medication early in Johnson's treatment. *Id.* She decided not to use
4   these medications, however, because Johnson was concerned side effects from the medications
5   could adversely affect her physical ailments. *Id.* Pritchard states specifically the decision to
6   forgo prescription medication "did not reflect a decrease in her level of impairment." *Id.*

7          The ALJ believed generally that the opinions of Johnson's treating physicians were not
8   supported by "significant mental status testing" and "diagnostic tests." His criticism is
9   problematic.

10         Psychiatric impairments are, by their nature, different from physical ailments. They are
11  not amenable to objective verification. *See Poulin v. Bowen*, 817 F.2d 865, 873 (D.C.Cir. 1987)
12  ("[U]nlike a broken arm, a mind cannot be x-rayed . . . ."). It is therefore not surprising that
13  the records from Johnson's treating physicians lack the type of supporting objective evidence
14  that is usually present in a case of physical disability. However, as long as Johnson's treating
15  physicians diagnosed and treated her condition according to the standard psychiatric
16  methodology, the ALJ should not discount their opinions because of a perceived lack of
17  objective testing. *See also Poulin*, 817 F.2d at 874 ("The report of a psychiatrist should not be
18  rejected simply because of the relative imprecision of the psychiatric methodology or the
19  absence of substantial documentation, unless there are other reasons to question the diagnostic
20  techniques.").

21          In October of 1999, Pritchard wrote a summary of her diagnostic methodology. (Tr. 409-
22  10). She explained that "a mental status examination is not conducted in every session of
23  ongoing psychotherapy." *Id.* Nevertheless, Pritchard did administer an MSE in January of
24  1996. *Id.* The results of that exam revealed "impairment in attention and concentration . . . with
25  confusion as to the sequence of recent events but intact long-term memory." *Id.* "In addition,
26  [Johnson] exhibited depressed mood with depressed and anxious affect accompanied by
27  tearfulness and occasional suicidal ideation." *Id.* Pritchard's diagnosis of dysthymic disorder
28  was based on "depressed mood more days than not for at least two years with no significant

- 15 -

symptom free period." *Id.* Pritchard further found "Johnson exhibited an overlay of major depressive disorder, recurrent, moderate, characterized by impaired sleep, psychomotor retardation, fatigue, diminished ability to concentrate, diminished interest and suicidal ideation." *Id.* Johnson's later diagnosis of post traumatic stress disorder was based on Johnson's "history of child sexual trauma, intrusive recollections of those events, over reactivity to symbolic clues as to those events and subsequent avoidant behavior, hypervigilance, and startle response." *Id.*

Goldwasser diagnosed major depression based on the following symptoms: "depressed mood, crying spells, frequent thoughts of suicide, anhedonia, poor appetite and inability to gain weight, chronic sleep disturbance, anergia, diminished cognitive ability including decision making, memory and difficulty concentrating." (Tr. 620). He diagnosed somatoform disorder based in part on "multiple physical symptoms for many years that have not been found to have a 'functional' or organic etiology." *Id.*; *See also* (Tr. 366-77).

There is no evidence indicating these treating physicians did not employ the standard psychiatric methodology in diagnosing and treating Johnson's mental condition. Accordingly, the ALJ's criticism of their diagnostic technique is unsupported.

Further, the opinions of Johnson's treating physicians on the issue of disability are supported by the observations of Judy Hutt and Leslie McGee. (Tr. 200, 354-55, 641-46). Hutt is a naturopathic physician, and McGee is an acupuncturist. *Id.* Neither is considered an "accepted medical source" by the SSA. *See* (Tr. 378); 20 C.F.R. § 404.1513(a). Accordingly, their opinions are not accorded the same deference as those offered by a physician. Nevertheless, their observations of Johnson's impairments should be credited as lay testimony. The testimony of a lay witness is "an important source of information about the clamant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness." *Regennitter v. Commissioner*, 166 F.3d 1294, 1298 (9th Cir.1999). In this case, the ALJ gave no reasons for discounting the observations of the lay witnesses. His implicit rejection of their opinions was error. *See* 20 C.F.R. § 404.1513(d)(4).

The diagnosis and treatment of Johnson's mental impairments necessarily relies on the subjective statements of the patient herself. Accordingly, the court considers whether or not the ALJ properly evaluated Johnson's subjective testimony of disability.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment or impairments" and "show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996). "The claimant need not produce objective medical evidence of the pain or fatigue itself or the severity thereof." *Id.* "Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom." *Id.* "Finally, the claimant need not show that her impairment could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused *some* degree of symptom." *Id.* (emphasis added). This approach to the evaluation of a claimant's testimony "reflects the highly subjective and idiosyncratic nature of pain and other such symptoms." *Id.*

Once a claimant makes the required showing "and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so." *Id.* at 1283-84. "[T]he ALJ may consider, for example (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Id.* at 1284. In this case, there is no evidence that Johnson is malingering. Accordingly, the ALJ could discount her subjective testimony of disability only by presented clear and convincing reasons for doing so. This he did not do.

The ALJ found Johnson "not to be a credible witness as to the nature and degree of her symptoms and limitations present on or before December 31, 1997." (Tr. 565). He explained his reasoning as follows:

- 17 -

> Her assertions of disability since January 1996, are inconsistent with her testimony she had been working a free-lance graphic designer as late as September 1996. . . . It is also worth noting that claimant's reported ability to hike four miles and swim to be inconsistent with her alleged disability onset date. There are also references in Appendix C that the claimant was experiencing difficulties in earning a living due in part to her moving to Arizona rather than secondary to any worsening of her impairments.

(Tr. 565). The record, however, does not support the ALJ's analysis.

As the court noted above, Johnson's earnings record *supports* her claim of disability. When she stopped working in September of 1996 she was averaging only $222.22 per month. The regulations presume earnings of less than $300 per month show the claimant was not engaged in substantial gainful activity. 20 C.F.R. § 404.1574(b)(3). Johnson's earning record supports her testimony of disability after January 1, 1996.

The ALJ's reliance on a report that Johnson could hike four miles and swim is misplaced. He refers apparently to a notation in Judy Hutt's medical records describing Johnson's ability to do these things. (Tr. 531). This notation, however, describes Johnson's ability in 1995, prior to her onset date, not her ability in 1996. *Id.*

Finally, the ALJ argues Johnson stopped working in September of 1996, not because her medical condition worsened but because she found it difficult to find clients in Tucson after she moved from New York. This inference is somewhat problematic. Johnson moved to Tucson from New York City in late 1991, a full five years before she stopped working. (Tr. 113). If Tucson's lack of clients was a significant problem it probably would have caused her to stop working in 1992 or 1993, not 1996 when she finally stopped. In fact, Johnson specifically states her business troubles were caused by her medical condition and not due to a lack of clients. (Tr. 113-14). The ALJ did not provide clear and convincing reasons for rejecting Johnson's subjective testimony of disability. Further, he did not provide specific and legitimate reasons for discounting the opinions of her treating physicians.

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1996). "Similarly, where the ALJ improperly rejects the claimant's testimony regarding her limitations, and the claimant would be disabled if her testimony were

- 18 -

1  credited, we will not remand solely to allow the ALJ to make specific findings regarding that
2  testimony." *Id.* "Rather, that testimony is also credited as a matter of law." *Id.* "Where we
3  conclude that a claimant's testimony or a doctor's opinion should have been credited and, if
4  credited, would have led to a finding of eligibility, we may order the payment of benefits."
5  *Regennitter v. Commissioner*, 166 F.3d 1294, 1300 (9th Cir.1999); *See also Pitzer v. Sullivan*,
6  908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did
7  not provide adequate reasons for disregarding examining physician's opinion); *Rodriguez v.
8  Bowen*, 876 F.2d 759, 763 (9th Cir.1989); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1988).
9       In this case, the ALJ improperly discounted the opinions of her treating physicians. The
10 ALJ also improperly rejected Johnson's subjective testimony of disability. All of this evidence
11 should be credited as a matter of law. Crediting this evidence indicates Johnson has been
12 disabled since January 1, 1996. *See Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) ("Factors
13 relevant to the determination of the date of disability include the individual's declaration of the
14 date of when the disability began, work history and available medical history."); *Swanson v.
15 Secretary*, 763 F.2d 1061, 1066 n.2 (9th Cir. 1985) (The claimant's onset date should be adopted
16 by the Commissioner if it is consistent with the available evidence.); *Willbanks v. Secretary*, 847
17 F.2d 301, 304 (6th Cir. 1988) (same). Remand of the case would serve no useful purpose. *See
18 Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide
19 the issue again would create an unfair 'heads we win; tails, let's play again' system of disability
20 benefits adjudication."); *Holohan v. Massanari* 246 F.3d 1195, 1210 (9th Cir. 2001); *Smolen
21 v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996) ("We may direct an award of benefits where the
22 record has been fully developed and where further administrative proceedings would serve no
23 useful purpose."); *See also* SSR 96-2p ("If a treating source's medical opinion is well-
24 supported and not inconsistent with the other substantial evidence in the case record, it must be
25 given controlling weight; i.e. it must be adopted."). Johnson has been waiting for her benefits
26 for almost nine years. *See, e.g., Podedworny v. Harris*, 745 F.2d 210, 223 (3rd Cir. 1984). A
27 finding of disability should be entered.
28

RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant the plaintiff's Motion for Summary Judgment, deny the defendant's Motion for Summary Judgment, and enter an order remanding the plaintiff's claim for an award of benefits. [#12, 18]

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (en banc), *cert. denied*, 540 U.S. 900 (2003). If objections are filed, the parties should direct them to the District Court by using the following case number: CIV 04-310-TUC-JMR.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 20th day of September, 2005.

_____
Glenda E. Edmonds
United States Magistrate Judge